Frances MARSHALL

v.

**GEORGIA PACIFIC CORPORATION and
United Brotherhood of Carpenters and
Joiners, Local 2661**

No. LR–76–C–385.

United States District Court,
E. D. Arkansas, W. D.

Order of Recusal Nov. 16, 1979.

Subsequent Opinion Nov. 26, 1979.

On Motion to Reconsider Jan. 16, 1980.

John W. Walker, Little Rock, Ark., for
plaintiff.

Philip K. Lyon, Little Rock, Ark., for
Georgia Pacific.

James E. Youngdahl, Little Rock, Ark.,
for Union.

ORDER OF RECUSAL

ROY, District Judge.

The above-captioned case was scheduled by this court's order of June 22, 1979 for a class certification hearing on November 14, 1979. On November 9, 1979, approximately five days before the class certification hearing, defendant Georgia-Pacific Corporation moved to dismiss both the class and individual claims set forth in the plaintiff's complaint on the ground that plaintiff's counsel had not complied with the following portion of this court's order of June 22, 1979:

> 2. At least ten days prior to *trial* the attorneys shall comply fully with Local Rule 9(f) and (g), exchanging lists of witnesses and exhibits, with copies to the Court. Any objections to the exhibits should be brought to the Court's attention at least ten days prior to trial. Witnesses and exhibits not listed may NOT be used at *trial* except in extraordinary circumstances. A trial brief should be submitted to the Court at that time also. [emphasis added]

The first portion of the order scheduled the class certification hearing for November 14th. The gist of the defendant's motion to dismiss was that plaintiff's counsel had not complied with Local Rule 9 ten days before the class certification hearing by providing defense counsel with copies of the plaintiff's list of witnesses and proposed exhibits. The plaintiff's response to the defendant's motion to dismiss was filed on November 13, 1979. The plaintiff's response, in essence, stated that compliance with Local Rule 9 ten days before the class certification hearing was not mandated by the June 22nd order because the order used the word "trial" instead of the word "hearing" or the phrase "class certification hearing." Under plaintiff's counsel's interpretation of the June 22nd order compliance with Local Rule 9 would not be required until ten days before the trial on the merits notwithstanding the context within which the word "trial" appears in the order. Aside from any specific order of the court, Rule 9 requires the same information be submitted before

pretrial. In this case, the pretrial was held on January 30, 1979.

The attorneys for the respective parties were given an opportunity to make their arguments either in support or opposition of defendant Georgia-Pacific Corporation's motion to dismiss. Mr. Philip Lyons, attorney for Georgia-Pacific Corporation, argued the motion on behalf of Georgia-Pacific. Mr. Lyons argued that both the class and individual claims should be dismissed for, essentially, three reasons: (1) plaintiff's counsel had not provided the defendants or their attorneys with lists of proposed witnesses and exhibits ten days prior to the class certification hearing as required by this court's order of June 22, 1979; (2) plaintiff's counsel had failed to pursue discovery procedures, including the failure to examine numerous documents which had been proffered to plaintiff's counsel; and (3) in numerous motions for continuances filed in the case, had admitted his resources are severely over-extended by his multiplicity of cases. Mr. Lyon's arguments on these contentions were vigorous and pointed.

Mr. Walker subsequently presented the plaintiff's arguments in opposition to defendant Georgia-Pacific Corporation's motion to dismiss. During the course of his arguments Mr. Walker made certain statements and suggestions which ultimately led to the court's decision to disqualify from any further proceedings in this cause. The clear implications of some of Mr. Walker's statements are: (1) that the court is racially biased against plaintiffs in employment discrimination lawsuits; (2) the administrative decisions of this court with regard to procedures for handling determinations of class certification issues have been racially motivated and designed to oppress black litigants; and (3) the court, because of its limited tenure, is unknowledgeable about the pre-existing rules with respect to Title VII, a very technical area. Early on in his argument Mr. Walker made the following statement:

With respect to the context in which we find ourselves, I think that it goes without saying, in all due respect to the Court, that we find ourselves continually, and still, in a racist society, in a racist community, in a racist country, *in a racist judicial system.* I say that in all due respect to the Court. Mindful of the fact that Congress, when it enacted Title VII, sought to overcome the history of racism, we in our efforts as private attorneys generals have sought to keep the faith with what this country said it stood for and we have filed cases. This case was filed in 1976. Some other cases were filed in 1975 and some were filed in 1974. And there is no year between 1965 and 1979 where this lawyer and those associated with him have not been in the court as many as 20 to 30 times on cases of this kind. Not one year. Now, for four years there were only two judges and there was a succession of judges within that period of time. If the cases had come before the judges as they should have come, had there been judges, then you would not have had a backlog. And if you had no backlog, then there would have been no need for the administrative decision from the Court of Appeals to try to clear up the backlog. But when the administrative decision is made to impact primarily upon one attorney, then that administrative decision is itself suspect. I say that because of the fact that in this district we have approximately 100 to 140 cases that are all civil rights in nature which have been filed. *For four judges to come in at one time, within a year or so, and then impact upon four attorneys, or less, within a context of removing one of the principal attorneys from the office, making him a magistrate[1], is to work a hardship upon not only counsel, but it is also to, in effect, give the appearance that the system of justice is designed to oppress*

1. This statement apparently refers to the appointment of the Honorable Henry Jones, United States Magistrate for the Eastern District of Arkansas. Mr. Walker evidently feels that the appointment of Magistrate Jones, his former law partner, was racially motivated and intended, in some manner, to oppress black litigants.

*blacks and to prevent blacks from having their day in court.* [emphasis added]

At another point Mr. Walker suggested that he was personally being treated unfairly and he questioned the impartiality of the District Court in Title VII cases. These conclusions are based on the following statements:

*Now, it is patently unfair—patently unfair—for the Court to impose conditions and restrictions which clearly impact upon just one attorney.* If you look at the docket of this court, you will see that the need for additional judges has come about because of the need primarily to deal with cases that we have filed. There wouldn't have been any backlog in this court had it not been for the fact that we had all of these cases filed.

In addition to that, that is due in part— that fact is also due in part to another fact, one of which is that any time we deal with—*historically we have dealt with this court—and we have found that we have had to get relief from the Court of Appeals rather than the District Court. Seldom have we been able to obtain relief from the District Court without appeals.* [emphasis added]

At still another point Mr. Walker suggested that the administrative policies of the court governing class actions were intended to oppress minority litigants. This conclusion is derived from the following statement by Mr. Walker:

I'm simply saying that a system which, in effect, overburdens plaintiffs who have historically been deprived anyway, and favors defendants who have all the resources and time and can paperwork counsel to death, then that system on its face is suspect. That's the only thing I'm saying. And where rules apply to one

side, but do not apply to the other, such as General Order 6,[2] then—and where those rules have just been recently adopted—then that just causes all kinds of problems.

In addition to the court's sincere and compelling desire to at all times give all litigants a fair and impartial trial, Canon 2 of the Code of Judicial Conduct states in pertinent part as follows:

A judge should respect and comply with the law and should conduct himself [or herself, as the case may be] at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

In view of Mr. Walker's unfounded and intemperate remarks, it might have been difficult for the court to hear this case with the impartiality essential to the fair administration of justice; even if the court in its own mind was convinced that the inappropriate comments could be entirely disregarded, still the appearance of impropriety might arise. This could occur because any witness, spectator, or party observing or listening to Mr. Walker berating the "community," "country," and "judicial system" as he did, could assume that the court would view these remarks with considerable displeasure. To be certain that this displeasure would not affect this litigation and to avoid the appearance of impropriety, this court hereby disqualifies itself from further consideration of the issues in the above-captioned case. The Clerk is directed to reassign this case in the customary manner.

### SUBSEQUENT OPINION

This Court recused itself in the above-styled case on November 14, 1979. The written order of recusal detailing the reasons for the recusal was filed November 16,

---

**2.** General Order No. 6 governs procedure in class actions filed in this district on or after July 1, 1979. The order was promulgated by Chief Judge Eisele. The purpose of the order was to define the scope of class actions so that all parties could plan more efficiently for trial, a goal which if attained would inure to the benefit of all litigants through savings in time and expenses. Contrary to Mr. Walker's sug-

gestion, the order applies to all actions, not just those filed by his law firm. Furthermore, General Order No. 6 does not apply to this case in any event. By the very terms of the order it applies to actions filed on or after July 1, 1979. We are therefore unable to perceive how this particular order imposes any oppressive burden or hardship in the present case.

1979. At the time the order was entered the Court restricted the recusal to the particular case at issue. The Court did not want to act hastily in deciding whether the scope of the recusal should be extended to other cases.

During the interval of almost two weeks since the hearing at which the incidents occurred necessitating the Court's recusal the entire matter has again been reviewed in depth. Careful consideration has been given to the inaccurate and intemperate remarks made by Mr. John W. Walker, and serious thought has also been given to the all-inclusive nature of the comments and the manner in which they were addressed to the Court. These remarks were not restricted to the trial of one specific case. Reflection on these factors and the reasons for recusal set out in the order of November 16th have caused the Court to reach the inescapable conclusion that the recusal order must be broadened.

Accordingly, this Court recuses itself in all cases of the John W. Walker law firm.[1] The Clerk is directed to file a copy of this order in each case in which the Court has recused itself. The Clerk is directed to reassign these cases in the customary manner. The Clerk is also requested to notify the parties of the recusal and to assign to this Court an appropriate number of cases in lieu of the cases in which recusal has been effectuated.

In the future no cases of the John W. Walker law firm should be assigned to this Court.

### ON MOTION TO RECONSIDER

On November 14, 1979 this court recused itself *sua sponte* from further consideration of the issues presented by the pleadings in the above captioned case because of certain statements made by Mr. John Walker, one of the attorneys for the plaintiff, during the course of his argument on a motion to dismiss which had been filed by defendant Georgia-Pacific Corporation. A formal order of recusal was entered on November 16, 1979. The November 16th order set out the reasons for the court's recusal[1] and quoted some of the statements by Mr. Walker which ultimately led to this court's decision to disqualify itself from proceeding further in this case. Since the filing of the court's written order of recusal Mr. Walker, attorney for the plaintiff, and Mr. Youngdahl, attorney for the defendant union, have each filed a motion and memorandum requesting the court to reconsider the reasons offered in support of the court's recusal decision. Mr. Lyons, attorney for defendant Georgia-Pacific Corporation, filed a vigorous response to plaintiff's motion for reconsideration of the order of recusal, to which Mr. Walker filed a reply on January 8, 1980. The court has not been requested to change its decision to withdraw from this action by any of the parties. The court will now consider the issues presented by these pleadings.

Mr. Walker's motion states, *inter alia*, that the court appropriately recused itself but has not specified wherein the remarks made by counsel were inaccurate and intemperate. A review of the November 16th order of recusal reflects that certain of the comments of Mr. Walker were quoted verbatim therein. Merely to read the remarks, without further in depth analysis, reflects their intemperance and inaccuracies.[2]

---

1. Regarding the *Derrick M. Nelson v. European Food Service, Inc.* case, No. LR–C–77–6, trial of this case was concluded on October 1, 1979, approximately one and one-half months prior to the hearing in which the Court recused itself. Briefs have been filed by the parties and the Court has resolved the issues, but no written opinion has been filed. Nevertheless, the Court will recuse itself in this case also unless the parties advise the Clerk's Office within ten days that they desire the Court to retain the case.

1. In addition to the applicable provisions of the Code of Judicial Conduct, provisions which were mentioned in this court's order of November 16, 1979, the decision to recuse was appropriate by reason of the provisions of 28 U.S.C. § 455(a).

2. The word "inaccurate", according to Webster's Third International Dictionary, means not in exact conformity to the truth and the word "intemperate" means not marked by moderation, but extreme or excessive.

However, since counsel has requested more definitive reasons for the recusal, the court is glad to elaborate on the order previously entered.

An attorney is expected to plead his case vigorously, but must nevertheless do so without interfering with the integrity of the trial process. This court's recusal did not result from an isolated instance of a single remark made by counsel zealously representing his client's cause. The recusal resulted from a series of inappropriate critical remarks and specious challenges to the court's ability and sense of fairness.

Mr. Walker in both his motion for reconsideration and his reply to Mr. Lyon's response has conveniently ignored all the reasons for recusal given in the court's order of November 16th except that concerning "racism". Let the record clearly reflect that it was not this remark alone but it was the accumulation of derogatory remarks by Mr. Walker reflecting adversely upon the policies of the Eighth Circuit, all the judges in the Eastern District of Arkansas, and one of the United States Magistrates, as well as this court, which caused the court's recusal.

It is first necessary to put the matter in proper perspective. At the time of the hearing on November 14, 1979, the court and the parties were addressing the issue of defendant's motion to dismiss. Mr. Walker's statements must be evaluated in light of the two issues to which he should have been responding: (1) Whether the plaintiff's action should be dismissed for failure to comply with the court's Order of June 22, 1979 and Local Rule 9, and (2) whether the class allegations should be dismissed because Mr. Walker and his associates had afforded inadequate representation as class counsel. The matter of class certification and racial issues were not before the court at that time. The series of intemperate and inappropriate remarks began with this statement:

> With respect to the context in which we find ourselves, I think that it goes without saying, in all due respect to the Court, that we find ourselves continually, and still, in a racist society, in a racist community, in a racist country, *in a racist judicial system.*

(emphasis supplied) (transcript, page 17, lines 15–19)

The court does not concede the accuracy of Mr. Walker's generalized statement as it relates to society, the community, or to the country. However, regardless of this portion of the statement, such a charge against the federal judiciary, in light of its leadership role in the battle for civil rights and racial equality, is illogical. The federal judiciary has vigorously protected the minorities from racial discrimination, particularly in the area of employment.

Counsel's comments completely ignore the tremendous strides which have been made in race relations both locally and nationally. This is not to deny that there may be vestiges of racism with us, but this does not warrant condemnation of the entire nation, state and community. As to the "racist judicial system" to which Mr. Walker refers, the Federal Reports speak officially and far more eloquently than this court could concerning the extent of the relief granted in many fields. A few of these are voting rights, integration of the schools, access to all public places, and affirmative action programs in employment.

Furthermore, the above statement constitutes generalization in the extreme, the same kind of generalization which, in the opinion of this court, provides the very cornerstone for racism. The statement, on its face, contains no qualifications, it makes no exceptions. The statement encompasses all members of the judiciary, state and federal, past and present, male and female. The statement encompasses judges of all races. In sum and substance, the statement is an affront to all members of the judiciary who have labored to effectuate the singular promise of our system of justice, "Equal justice under the law".

According to Webster's Third International Dictionary, the definition of the word racism means racial prejudice or discrimination against a particular race. *Whether an individual is a racist is not determined by the color of one's skin; it is determined by*

the state of the mind and heart of the individual. Therefore it does not follow a fortiori that because an individual or a judge is white that he is a racist. Nor does it follow that because an individual or a judge is black that he is not a racist. Certainly then, statistics given by counsel indicating a scarcity of black judges does not prove that the white judiciary is racist. Furthermore, the 1971 statistics in support of counsel's motion are now outdated. As of November 2, 1979 there were 43 black judges serving on the federal bench, more than double the figure of 19 mentioned in counsel's motion. It is also noted that the names of many more blacks are now under consideration for appointment to United States District Courts[3] and to the Circuit Courts of Appeal. A black is also now serving on the Arkansas Supreme Court.[4]

However, assuming arguendo that the issue of class certification had been reached, the racist comments of Mr. Walker nevertheless were inappropriate. The court is required by law to consider only those issues pertinent to the matter being heard. Counsel's uncalled for remarks concerning society, community and the judicial system are not appropos to indicate racial discrimination, if any, in the employment practices of the defendant Georgia-Pacific Corporation.

Continuing along the same lines, Mr. Walker said:

And if you had no backlog, then there would have been no need for the administrative decision from the Court of Appeals to try to clear up the backlog. *But when the administrative decision is made to impact primarily upon one attorney, then that administrative decision is itself suspect.*

(emphasis supplied) (transcript, page 18, lines 8–13)

Thus Mr. Walker charges either the Eighth Circuit Court of Appeals is prejudiced against him for directing the Eastern District of Arkansas to give Title VII plaintiffs their day in court and to provide them with a resolution to their grievances; or, in the alternative, this court's actions are unfair and "suspect" for moving Title VII cases along to trial. In either event the conclusion is a distortion of the truth. Justice delayed is justice denied and these plaintiffs deserve their day in court.

As far as the "one attorney" aspect is concerned, Mr. Walker is *not* the only lawyer in Arkansas practicing in the Title VII field. There is a defendant's counsel who is also affected in every Title VII case. Nor is Mr. Walker the only plaintiff's counsel in Title VII litigation. There are also other attorneys in this field.[5]

However, perhaps the most irresponsible of all Mr. Walker's remarks was the one concerning the appointment of the Honorable Henry Jones, a black, as United States Magistrate[6] for the Eastern District of Arkansas. In that connection Mr. Walker said:

For four judges to come in at one time, within a year or so, and then impact upon four attorneys, or less, within a context of removing one of the principal attorneys from the office, making him a magistrate, is to work a hardship upon not only counsel, but it is also to, in effect, *give the appearance that the system of justice is designed to oppress blacks and to prevent blacks from having their day in court.*

(emphasis supplied)

The name of Henry Jones for possible appointment as magistrate came to the

3. These names include that of the Honorable George Howard, outstanding attorney, former Arkansas Supreme Court Justice, and now a member of the Arkansas Court of Appeals.

4. Honorable Richard Mays, a former partner of Mr. Walker, was sworn in as a member of the Arkansas Supreme Court on January 3, 1980.

5. To mention a few, some of Mr. Walker's former associates handling considerable litiga-

tion in this area are Mr. P. A. Hollingsworth, Mr. Phil Kaplan, Mr. Jack Lavey and Mr. John Bilheimer. Prior to his appointment to the Arkansas Supreme Court, Mr. Richard Mays was also very active in this field.

6. The position of U.S. Magistrate is a most important position in the federal judiciary and the duties are very similar to those of a United States District Judge.

Eastern District Judges on recommendation from the Judicial Selection Panel which was composed of outstanding attorneys and lay persons. Mr. Jones' name, along with four others, was selected by that panel from approximately thirty applicants. The panel submitted five names to the court. The four judges in the Eastern District then interviewed the five prospects and selected Mr. Jones. Judge Jones came to the court highly recommended by members of the judiciary and the bar, including outstanding black and white attorneys. In fact, two of the black attorneys formerly in Mr. Walker's law firm commended him very highly for the appointment. Certainly there is no logic to the contention that this appointment was "*designed* to oppress blacks and to prevent blacks from having their day in court".

(emphasis supplied)

The next gratuitous remark by plaintiff's counsel appears at page 19 of the transcript of the November 14th hearing:

Now it is patently unfair—patently unfair—for the Court to impose conditions and restrictions which clearly impact upon just one attorney.

The court is unaware of any condition or restriction which has been applied to only one attorney. If counsel is referring to the rules governing procedure before the United States District Court, those rules apply without exception to all litigants and to all attorneys practicing before the court. Certainly it is *not* patently unfair for Mr. Walker to be held accountable to the same rules and standards as all other attorneys.

The next intemperate and incorrect statement by plaintiff's counsel appears at page 19 of the transcript of the hearing on November 14th:

. . . . historically we have dealt with this court—and we have found that we

have had to get relief from the Court of Appeals rather than the District Court. *Seldom have we been able to obtain relief from the District Court without appeals.*

(emphasis supplied)

Plaintiff's counsel is well aware that the judges of this court have granted relief to his clients in a number of cases. Successful litigation at the District Court level is reported daily by the news media, *i. e.,* television, radio and newspapers. The files in the United States District Court Clerk's Office, as well as the Federal Reports, reflect that there are many cases in which plaintiffs prevail in Title VII actions at the District Court level in the Eastern District of Arkansas. This court has granted relief to clients of Mr. Walker in cases where such was merited.[7] Furthermore, the Court of Appeals for the Eighth Circuit has never directed this court to grant relief to any of Mr. Walker's clients. Mr. Walker appealed this court's denial of injunctive relief to plaintiffs in the case of *Trotter and Williams v. The Board of Trustees of the University of Arkansas, et al,* LR–C–78–232, August 14 and August 30, 1978. However, both the Court of Appeals for the Eighth Circuit and the United States Supreme Court refused to set aside the district court's orders denying relief to the plaintiffs.

Judges Richard Arnold, William Overton, and this court have never been reversed by the Court of Appeals for the Eighth Circuit in a civil rights action, nor directed by that court to give relief to any client of Mr. Walker's in any case. The record, however, does reflect that relief has been given in a number of Title VII cases to Mr. Walker's clients at the District Court level.

The other judges in the Eastern District of Arkansas have been on the bench a much longer period of time than Judges Overton,

7. *Carolyn F. Hunter v. University of Arkansas,* LR–C–79–352, 20 FEP Cases 1643 (E.D. Ark. 1979). The court ordered the School of Medicine of the University of Arkansas to employ the plaintiff for the position of instructor. A copy of the Preliminary Injunction is attached hereto as Appendix A. *Johnson, et al v. Brace and Harry Brace Health Spa,* 472 F.Supp. 1056.

The court gave relief in this action to three plaintiffs and an intervenor. The relief granted included actual damages, punitive damages, and the granting of injunctive relief against the defendant. Dr. Hunter and three of the parties to whom the court gave relief in the *Spa* case were black. A copy of the Order in the *Spa* case is attached as Appendix B.

Arnold and Roy, but the record reflects that their reversals, if any, have been most infrequent while favorable decisions in Title VII actions have been of significant number.

Mr. Walker next criticized the court's handling of other cases not pertinent here and continued his diatribe with these words:

> I'm simply saying that a system which, in effect, overburdens plaintiffs who have historically been deprived anyway, and favors defendants who have all the resources and time and can paperwork counsel to death, then that system on its face is suspect. That's the only thing I'm saying. And where rules apply to one side, but do not apply to the other, such as General Order 6*. . . . (*attached as Appendix C)

(transcript, page 25, lines 19–25)

Again Mr. Walker maligns the court by claiming that its procedures are unfair and applies rules to one side that do not apply to the other when neither accusation has any substance in fact.

Ordinarily the burden on defendant employers of answering plaintiff's requests for information is much more burdensome and voluminous than that imposed on plaintiff.

The second argument, that the court applies rules, specifically General Order 6, to one side that are not applied to the other is equally erroneous. The only purpose of General Order 6 is to ensure the expeditious prosecution of class actions as required by Rule 23(c)(1) of the Fed.R.Civ.P. which states:

> As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.

Certainly the imposition of such rules is neither racist in intent or in effect as Mr. Walker would have us believe. The rules exist only to guarantee that both parties, plaintiff and defendant alike, receive their day in court without undue delay.

Mr. Walker then questioned the competence of this court, Judge Arnold, and Judge Overton [8] to hear Title VII cases:

> Judges, basically, with all due respect to Her Honor, who are new and *inexperienced*, are basically, at least at some point, *unknowledgeable* about the pre-existing rules with respect to Title VII, a very technical area.

(emphasis supplied) (transcript, page 26, lines 7–11)

In order that there be no mistake as to the implication of this comment concerning the qualifications of white federal judges, Mr. Walker, in his Motion for Reconsideration, stated:

> When the President seeks to appoint a black Federal judge, suddenly *the local qualification rules shift from one of absolutely no qualifications other than having a law degree for a few years* to a determination that only the "best qualified", whatever that means, should be named;

. . .

(emphasis supplied)

The court knows of no individual ever appointed to the federal bench in Arkansas or in any other state whose only qualification was "having a law degree for a few years" nor has Mr. Walker made reference to any such appointment. This statement, which has no basis in fact, reflects upon the good judgment of our distinguished United States Senators (both present and past), the Senate Judiciary Committee, and the President of the United States.

Certainly the competence of Judges Arnold and Overton cannot rationally be questioned. Both have applied themselves assiduously to their responsibilities on the federal bench. Both came to the bench after impressive records as trial attorneys for periods of approximately fifteen years (Overton) and twenty years (Arnold). In undergraduate and law school both graduated with top honors from their respective schools, Yale, Havard and the University of

---

**8.** At the time of the hearing Judges Overton, Arnold and Roy had each served less than two years on the federal bench. Judge Overton was sworn in as a federal judge on May 31, 1979; Judge Arnold on October 16, 1978; and Judge Roy on December 9, 1977.

Arkansas. It would perhaps be immodest for this court to assess her own qualifications, but Mr. Lyons, in his Response, has given an accurate review of this court's legal experience.[9]

Having "elaborated" on Mr. Walker's intemperate and inaccurate remarks, the court can think of no better words to summarize the whole matter than those used by Mr. Lyons in his Response for Georgia-Pacific where he stated:

These are the remarks of Mr. Walker which Her Honor most generously characterized as merely inaccurate and intemperate.

1. His claim that the federal judiciary is racist.

2. His claim that the administrative order of the Eighth Circuit Court of Appeals is racist either in intent or through Judge Roy's application.

3. His claim that court rules impact only on himself and his associates.

4. His claim that the appointment of the Honorable Henry Jones as a federal magistrate was racist either in intent or effect.

5. His claim that the United States District Court for the Eastern District of Arkansas is racist and that he could only find relief in the Eighth Circuit.

6. His attack on Judge Roy's conduct in other cases with its racist implications.

7. His claim that the court favors defendants.

8. His claim that court rules, such as General Order 6, apply to one side but not to the other.

9. His claim that the recently appointed federal judges, including Judge Roy, lack the competence to hear Title VII cases.

In reviewing the all-inclusiveness of these statements, the court considers them to be an affront to the judiciary as a whole more than to this court personally. However, as a member of the judiciary which has been attacked in such fashion this court finds the remarks most discourteous and offensive. After hearing them, the court had grave concern with respect to the continuance of its complete impartiality of judgment as far as Mr. Walker's client or clients were concerned. Human nature being what it is, the court's displeasure, frustration and annoyance with Mr. Walker's gratuitous remarks could have affected, at least subconsciously, the court's consideration of his client's cause of action. Thus, the plaintiff might not have received the fair and impartial trial which every party is entitled to in every case. These remarks were of the nature that they could not be erased from the court's mind, nor soon forgotten. Accordingly, the court in all good conscience deemed it wise to step aside in all cases of the Walker law firm.

The major portion of both Mr. Walker's Motion for Reconsideration and also his Reply to Mr. Lyon's Response to the Motion deals with the merits of the Motion to Dismiss. This motion is no longer before this court and it is not pertinent to the Motion for Reconsideration. It is unfortunate that Mr. Walker did not present these arguments at the Hearing on November 14th instead of indulging in his irrelevant comments as indicated above.

Plaintiff's counsel asks that the court amend its order concerning his requests for continuances in this case, but the recusal order which plaintiff's counsel requested to be modified makes no mention of requests

---

9. "This attack on judicial competence is particularly scurrilous as it relates to Her Honor individually. It is hard to imagine a legal career better suited to prepare someone for ascension to the federal bench than hers. Her Honor has had a substantial practice as a private practitioner; she has served as counsel for both state and federal governmental agencies; she has been an Arkansas Circuit Judge; an Arkansas Supreme Court Justice; and served a lengthy apprenticeship as a law clerk to Justice Frank Holt of the Arkansas Supreme Court and to United States District Judges Gordon Young and Paul X Williams. Certainly this has more than adequately prepared her for her role as a member of the federal judiciary. Again Mr. Walker chose to attack the judiciary rather than respond to the issues."

for continuances.[10] Neither does the court find any merit in Mr. Walker's arguments concerning alleged ambiguity in the court's order of June 22, 1979. (attached as Appendix D)

As the court pointed out during its comments from the bench on November 14, 1979, the word "trial" is a legal term. "Trial" refers to a formal judicial consideration of one or more issues which have been raised by the pleadings or papers in a particular case. Black's Law Dictionary, Third Edition, defines the word "trial" as a judicial examination, in accordance with the law of the land, of a cause, either civil or criminal, of the issues between the parties, whether of law or fact, before a court that has jurisdiction over it. Webster's Third International Dictionary defines "trial" as the formal examination of the matter in issue in a cause before a competent tribunal for the purpose of determining such issue; the mode of determining a question of fact in a court of law. In the present case the word "trial" appears in the second paragraph of this court's Order of June 22, 1979, an order which, in its first paragraph, scheduled this case for a class certification hearing. The very next paragraph of the June 22nd Order, the paragraph in which the word "trial" appears, delineates the requirements which have become the subject of dispute. Plaintiff's counsel has argued that compliance with Local Rule 9 was not required by the order since the second paragraph of the order requires compliance ten days prior to "trial" rather than ten days prior to the "hearing". Notwithstanding the definitions of the word "trial", definitions which clearly include a judicial examination of an issue such as class certification, the time for complying with the requirements of the June 22nd Order is readily apparent when the word "trial" is read in context with the rest of the order. The subject matter of the June 22nd Order was the class certification hearing. Thus, in

view of the definitions of the word "trial" and the context within which that word was used in the June 22nd Order, we find no basis for rescinding our initial appraisal of the ambiguity argument advanced by plaintiff's counsel and counsel for the defendant union.

There are additional reasons for declining to rescind our characterization of the ambiguity argument advanced by counsel. First, plaintiff's counsel has practiced law before this and other courts for several years. He has on numerous occasions appeared before this and other federal courts for the purpose of participating in class certification hearings in Title VII cases. Counsel for the defendant union is also an experienced lawyer. If these attorneys were recent law school graduates, if they had little or no experience with federal practice and procedure, the court might find their ambiguity argument plausible. That is not the case here. Rule 9 of the Local Rules, United States District Court for the Eastern and Western District of Arkansas provides in pertinent part:

(f) Within a reasonable time before the *pre-trial conference* attorneys for the respective parties shall:

(1) Exchange lists showing name, address, and general nature of the testimony of each witness (except those to be used solely in rebuttal) expected to be used at trial;

(2) Exhibit to opposing counsel all documents or exhibits (except those to be used solely in rebuttal) intended to be introduced in evidence or used at the trial; . . . . .

(emphasis supplied)

Counsel know, or at least at this point should know, that any time this court conducts an evidentiary hearing counsel are expected to make their witnesses known to opposing counsel prior to the time of hearing and to show their proposed exhibits to

---

10. This case was filed November 23, 1976. On February 12, 1979 the court gave the parties an additional 90 days to complete discovery. On June 22, 1979 the case was set for class certification hearing approximately five months later,

November 14, 1979, so there is no logical reason why the witness lists and proffered exhibits could not have been furnished to opposing counsel by Mr. Walker prior to the hearing on November 14, 1979.

counsel for the opposing party prior to the hearing also. These requirements are not burdensome unless, of course, an attorney is not prepared for the hearing and cannot, therefore, comply with these requirements. These disclosure requirements are not unique to Title VII litigation, they apply in every case and are designed to expedite the proceedings. Without these requirements, proceedings are delayed by the necessity of a recess every time another exhibit is offered into evidence. Such delays cost the litigants time and money. Furthermore, even if the rules and orders of this court did not require such disclosures, common sense and professional courtesy would.

Lastly, and most unfortunately, there is a substantial question as to whether plaintiff's counsel advanced the ambiguity argument in good faith. Plaintiff's counsel has taken the position that compliance with the second paragraph of this court's Order of June 22, 1979 was not required before the class certification hearing, a hearing which was scheduled for November 14, 1979. A response to defendant Georgia-Pacific's motion to dismiss was filed by one of the plaintiff's attorneys on November 13, 1979, one day before the class certification hearing in this case. The response argues that compliance with Local Rule 9 was required ten days prior to trial, rather than ten days prior to the class certification hearing. In an earlier pleading, however, a motion for an extension of time filed by Mr. Walker for the plaintiff on November 8, 1979, plaintiff's counsel set out a schedule of appearances before the United States District Courts for the Eastern District of Arkansas. In the last sentence of paragraph three of the motion plaintiff's counsel states, ". . . it has been impossible to devote the necessary time and attention to the *required* paperwork involved in the *Marshall* case". (emphasis supplied) On the next page of the same motion plaintiff's counsel again states, at paragraph four, "It

has been virtually impossible for plaintiff to meet *the requirements set forth in the Order of June 22, 1979*, due to the reasons heretofore submitted." (emphasis supplied) When the pleadings are scrutinized it appears that plaintiff's counsel felt that compliance with this court's Order of June 22nd was required prior to the November 14th class certification hearing. That position is reflected in counsel's request for an extension of time, a request which was filed on November 8, 1979, approximately six days prior to the class certification hearing. The position of plaintiff's counsel suddenly changed, however, on November 13, 1979, one day before the scheduled hearing. On that date plaintiff's counsel filed a responsive pleading which, for the first time, stated the position that compliance with this court's June 22, 1979 Order was not required before the class certification hearing in this case. If plaintiff's counsel actually believed that compliance with the June 22nd Order was not required before the class certification hearing on November 14th, it is extremely difficult to imagine why counsel mentioned inability to "meet the requirements set forth in the Order of June 22, 1979" as a justification for an extension of time on November 8, 1979, particularly since no trial date had been scheduled as of that date.[11] In addition, the court finds it difficult to assign any credibility to the ambiguity argument when neither counsel for the plaintiff nor counsel for the defendant union ever requested clarification of the June 22, 1979 Order. On June 26, 1979 counsel for Georgia-Pacific wrote the court, with copy of the letter to Mr. Walker, stating: "We have absolutely no problem with the setting or the requirement that witness lists and exhibits be exchanged with a copy to the Court."

In his Reply, Mr. Walker asks: "What is the speech standard that an attorney is to observe when appearing before the court so as to avoid the Court's invocation of 28

---

**11.** Rule 11 of the Federal Rules of Civil Procedure requires that pleadings be signed by an attorney representing a party. The signature of an attorney constitutes a certificate by him that he has read the pleading, that to the best of his knowledge, information and belief there is good ground to support it and that the pleading has not been interposed for purposes of delay.

U.S.C. § 455?" In answering that query the court refers to the Code of Professional Responsibility which establishes the speech standard and conduct standard which an attorney should observe.

(a) DR 7–106(C)(6)  In appearing in a professional capacity before a tribunal, a lawyer shall not: . . . Engage in undignified or discourteous conduct which is degrading to a tribunal.

(b) EC 7–36  Judicial hearings ought to be conducted through dignified and orderly procedures designed to protect the rights of all parties.  Although a lawyer has the duty to represent his client zealously, he should not engage in any conduct that offends the dignity and decorum of proceedings.  While maintaining his independence, *a lawyer should be respectful, courteous and aboveboard in his relations with a judge or hearing officer before whom he appears.* (emphasis supplied)

(c) DR 8–102(B)  *A lawyer shall not knowingly make false accusations against a judge or other adjudicatory officer.* (emphasis supplied)

(d) EC 9–6  Every lawyer owes a solemn duty to uphold the integrity and honor of his profession; to encourage respect for the law and for the courts and judges thereof; to observe the Code of Professional Responsibility; . . . .

(e) EC 9–1  Continuation of the American concept that we are to be governed by rules of law requires that the people have faith that justice can be obtained through our legal system.  A lawyer should promote public confidence in our system and in the legal profession.

(f) EC 9–2 . . . When explicit ethical guidance does not exist, a lawyer should determine his conduct by acting in a manner that promotes public confidence in the integrity and efficiency of the legal system and the legal profession.

Accordingly, the cited sections and others in the Code of Professional Responsibility give an in-depth answer to Mr. Walker's question.

The court feels that some additional explanation is in order in light of this court's decision to extend its November 16th Recusal Order to all cases involving members of the Walker law firm.  This action was deemed necessary since Mr. Walker is not only the nominal head of the law firm, but he directs all the activities of the firm.  Quite frequently he appears at the trial though other members of his firm may have filed all the pleadings and may have also appeared at the scheduled pre-trials.

The court has no intention of recusing itself from every case handled by a black attorney or from every case handled by an attorney who in the past has been associated with Mr. Walker's law firm.  The Recusal Order of November 16, 1979 was entered because of the remarks of counsel and not because this court had any racial bias or prejudice toward blacks.[12]  For this reason the recusal will be restricted to those cases handled by the attorneys presently associated with the John Walker law firm and his former partner Mr. P. A. Hollingsworth.

A separate order will be entered in the case of *Gloria Woods and France Thomas v. Commercial National Bank of Little Rock;* LR–75–C–362, in which Mr. P. A. Hollingsworth has also filed a motion requesting this court to recuse itself.  The motion will be granted because Mr. Hollingsworth, a former partner, still shares office space with Mr. Walker and they "employ common personnel and consult on various cases." However, the court does not intend to re-

12. In 1966, during this court's tenure as Circuit Judge for Pulaski and Perry Counties, blacks were summoned to serve on civil petit juries for the first time in these counties.  This was possible because the Jury Commissioners for the first time were instructed by the court to submit a proportionate number of names of black citizens for the jury panel.  Mr. Walker was well aware of this action and voluntarily dismissed a Motion to Quash the jury panel after ascertaining that this court had instructed the Jury Commissioners to follow the requirements of the Constitution and the United States Supreme Court in making up their lists.  In fact, in 1966 Mr. Walker commended the court for taking this step forward in helping blacks secure their rights.

cuse itself in any cases in which the parties are represented by other *former* associates of Mr. Walker, nor in any case solely because blacks are parties to the action.

For each of the above and foregoing reasons, the Motion for Reconsideration is granted to the extent that the motion seeks amplification of the reasons for recusal set forth in this court's Order of November 16, 1979. The Motion for Reconsideration is denied to the extent that the motion seeks withdrawal or modification of any part of this court's Order of November 16, 1979.

IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED that the Motion of plaintiff's counsel for Reconsideration of this court's Recusal Order of November 16, 1979 should be and the same is hereby denied except as indicated above.